## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANN MELTON**
**GREGORY DUTKA**
8554 Staffordshire Court
Elk Grove, CA 95624

and

**RICHARD WILLIAMS**
23 Anacostia Road, NE
Washington, DC 20019

Plaintiffs, on behalf of themselves and all
others similarly situated,

   v.

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**,

**SERVE:**

Mayor Muriel Bowser
Designee Darlene Fields
Civil Litigation Division, Ste 600 South
441 4th Street, NW
Washington DC 20001

and

Karl A. Racine, Esq.
D.C. Attorney General
Designee Darlene Fields
Civil Litigation Division, Ste 600 South
441 4th Street, NW
Washington DC 20001

Defendant.

Civil Action No:

---

### CLASS ACTION COMPLAINT

**Complaint For Judgment For Money Damages And Injunctive Relief And Declaratory Relief
With Jury Demand**

1.     This is a class action complaint for a judgment for money damages and declaratory judgment and injunctive relief under 42 U.S.C. § 1983 against the Government of the District of Columbia (hereinafter "District of Columbia" or the "District").

2.     The Named Plaintiffs, Ann Melton, Gregory Dutka, and Richard Williams, are persons whose currency was seized by the Metropolitan Police Department ("MPD") for forfeiture determinations and civil forfeiture which then sent the money to the United States Department of Justice (the "DOJ") shortly after seizing the currency for "adoption" (defined below).

3.     This lawsuit challenges the District's civil forfeiture procedure as it relates to "adoption" because the system lacks constitutional sufficiency with respect to notice and hearing procedures.

## Jurisdiction and Venue

4.     This Court has jurisdiction over plaintiffs' 42 U.S.C. § 1983 claims under 28 U.S.C. §1331 and 28 U.S.C. §1343(3)-(4).

5.     Venue is proper in this jurisdiction pursuant to 28 U.S.C §1391(b) because the events or omissions underlying the claims occurred in this judicial District.

## Parties

6.     The MPD seized currency belonging to Ann Melton, Gregory Dutka, and Richard Williams for civil forfeiture determinations and civil forfeiture and then transferred it to the US Government for "adoption."

7.     Defendant District of Columbia is a municipal corporation capable of being sued under D.C. Code § 1-102.

8.     During all events described herein, all police officers or civilian employees referred to herein, named or unnamed, unless otherwise specified, were police officers or civilian employees

of the District of Columbia Metropolitan Police Department acting within the scope of that employment, in furtherance of the interests of the District of Columbia, and under color of the statutes, ordinances, rules, customs, and usage of the District of Columbia.

## Non-party Actors

### The MPD Property Clerk

9.    The Property Clerk is not a party to this action because the Property Clerk is an employee of the MPD. D.C. Code § 5-119.01(a). The Property Clerk is a member of the MPD but the Property Clerk's staff consists of civilians who are not members of the MPD. D.C. Code § 5-119.01(a).

10.    The Property Clerk statute prohibits the MPD's Property Clerk from releasing currency that was feloniously obtained or currency that is the proceeds of crime until the US Attorney certifies that such currency is not needed as evidence in the prosecution of a crime. D.C. Code § 5-119.06(d).

### The "United States attorney for the District of Columbia or his assistants"

11.    The United States attorney for the District of Columbia is not a defendant in this case. But, the "United States attorney for the District of Columbia or his assistants" (the "US Attorney") prosecutes felony cases and most misdemeanor cases under the D.C. Code pursuant to D.C. Code § 23-101(c).

12.    The US Attorney also prosecutes minor cases under the D.C. Code which are normally prosecuted by the OAG if the minor cases are joined with a felony or misdemeanor and if the OAG consents pursuant to D.C. Code § 23-101(d).

13.     Section 23-101 is part of an "Act of Congress applicable exclusively[1] to the District of Columbia," and thus is "considered to be a statute of the District of Columbia" for purposes of § 1983. 42 U.S.C.A. § 1983.

14.     The D.C. Code is also an "Act of Congress applicable exclusively to the District of Columbia" which the Congress has given the D.C. Council power to amend (subject to Congressional approval). D.C. Code § 1-206.02(c)(2).

## Factual Allegations

### Seizures of currency in the District by the MPD: An Overview

15.     The MPD and other law enforcement agencies operating in the District of Columbia make warrantless seizures of currency for use in investigations, prosecutions, and for forfeiture determinations and civil forfeiture under the District's civil forfeiture regime.

16.     Throughout the Class Period (April 1, 2010 to the end of this case) the District's practice has been and remains that when the MPD agent seizes any currency for civil forfeiture or as evidence from a person the MPD seizes all currency on a person or in the vehicle they occupy without regard to whether any indicia of wrongdoing subjecting all the money to forfeiture or as evidence exists.

17.     The D.C. Council found after hearings that not only can civil forfeiture be unfair to property owners, it can create a conflict of interest for police departments, which stand to gain a

---

[1] D.C. Code § 23-101 derives from an Act to Establish a Code of Law for the District of Columbia, ch. 854, § 932-933, 31 Stat. 1189, 1340-41 (1901). The District of Columbia Court Reform and Criminal Procedure Act of 1970, PL.91- 358, 84 Stat. 473, 604-605 (1970), created the current version. D.C. Code § 1-204.35(AG elected).

tremendous amount of revenue from civil asset forfeiture. Committee Report, p. 22 (Report on Bill 20-48, "Civil Asset Forfeiture Amendment Act of 2014").

18.     Sometimes the MPD sends currency seized under that authority to seize property for civil forfeiture for adoption by an agency of the US government.

19.     Sometimes MPD seizes currency for more than one reason, for example, MPD officers may place an investigative hold on currency seized in a drug arrest which the Mayor also intends to detain for civil forfeiture or the MPD intends to send to the DOJ for adoption and the prosecutor holds as possible evidence.

20.     The District has never publicly disclosed the criteria it uses to send currency to the DOJ for adoption nor has the District published any regulations or general orders on the subject.

**The District's civil asset forfeiture regime**

21.     The District of Columbia has a civil asset forfeiture regime for seizing and forfeiting property such as currency which the MPD states was used in connection with a crime. *See e.g.,* D.C. Code § 48-905.02. There are several statutory provisions pertaining to forfeiture for various offenses but each one employs generally the procedures outlined in D.C. Code § 48-905.02, as amended, which relates, among other things, to seizures of cars, money, and other property involved in offenses involving "controlled substances."

22.     Under the pre-amendment civil forfeiture statute currency seized for civil forfeiture was in the custody of the Mayor. D.C. Code § 48-905.02(d)(2).

23.     Under the amended version of the statute, which became effective June 15, 2015, property subject to forfeiture is deemed to be in the custody of "the District." D.C. Code § 41-303(b)(1).

24.     The District's civil forfeiture regime is the exclusive means for determining possession and title to currency seized for a forfeiture determination under the pre-amendment civil forfeiture

regime and the current statute even if the currency were also seized for investigation or as possible evidence.

25.     The amended civil forfeiture statute provides that the District shall not release property seized for forfeiture while it is being retained as evidence in a criminal case.

26.     Therefore, Rule 41(g) does not extend to currency seized for forfeiture determinations under either the previous statute or the current statute unless and until the MPD determines that seized currency is not subject to forfeiture.

27.     Moreover, judicial officers in both the District Court and the Superior Court have a practice of not entertaining Rule 41(g) motions for return of currency until they ascertain whether the District intends to institute civil forfeiture proceedings against the currency.

28.     In any event, MPD transfers currency to DOJ for adoption before owners have an opportunity to file a Rule 41(g) motion for return of their currency.

29.     Therefore, owners had no way of challenging the District's seizure of their currency for civil forfeiture or the continued retention of their currency pending the outcome of the forfeiture determination.

## Investigative and evidentiary seizures and holds

30.     When the District seizes currency for use as possible evidence the currency itself is virtually never offered as evidence in criminal proceedings. The government uses photocopies.

31.     However, if the MPD decides to send seized currency to the DOJ for adoption the MPD sends the currency within 30 to 60 days of seizure without obtaining a release from the US Attorney pursuant to the Property Clerk statute. D.C. Code § 5-119.06(d).

**Adoption: Transfer to the federal government for adoption gives the money to the MPD instead of the general coffers of the District at the expense of ordinary people**

32.    Local and state seizing agencies are able to profit from piggy-backing on federal forfeiture powers through adoption, also called equitable sharing[2] - a system that allows police departments such as the MPD to hand over assets seized pursuant to local civil asset forfeiture regimes to federal agencies and receive back as much as eighty percent of the assets' value.

33.    An adoption occurs when a state or local law enforcement agency such as the MPD seizes property and requests one of the federal seizing agencies to "adopt" the seizure and proceed with federal forfeiture.

34.    Federal agencies may adopt such seized property for forfeiture where the conduct giving rise to the seizure is in violation of federal law and where federal law provides for forfeiture.

35.    A state or local law enforcement agency requesting federal adoption of a state or local seizure is supposed to comply with all applicable state laws and regulations pertaining to the transfer of seized property to a federal law enforcement agency, including any requirement for a state judicial order or prosecutorial consent (e.g., declination letter) for such transfer.

36.    Using adoption the federal government has given billions of dollars in cash to local police departments that can be used only by the local law enforcement agency and only for local law enforcement purposes.

---

[2] Adoption emerged from a provision in the Comprehensive Crime Control Act of 1984 and permits federal agencies to adopt seizures or pursue a joint investigation with a state agency in order to initiate a forfeiture action under applicable federal statutes. Pub. L. No. 98-473, 98 Stat. 1976 (codified at 21 U.S.C. § 881(e)(1)(A) (2012)). In 2012, the federal government paid more than $ 447 million to state and local agencies through the equitable sharing program. *See* U.S. Dep't of Justice, FY 2012 Asset Forfeiture Fund Report (2012), available at http://www.justice.gov/jmd/afp/02fundreport/2012affr/report2b.htm.

37.     Figures produced by the MPD in response to a FOIA request indicate that the MPD transferred over $7,000,000 in currency to the US government for adoption in 2011 and 2012.

38.     The District has never publicly published any regulations or general orders or other documents establishing the criteria which it uses to decide to transfer seized currency to the US government for adoption.

39.     But, the minimum monetary thresholds set by the DOJ for adoptive forfeitures for currency and currency substitutes, *e.g.*, bonds, is $2,000.

40.     DOJ regulations require that requests for adoption of currency must be submitted to the federal investigative agency within 30 calendar days of the state and local seizure date.

41.     Department of Justice policy requires shared monies and property to be used for law enforcement purposes only, that is, the MPD's share of adopted funds must be retained by the MPD.

42.     In determining whether "supplantation" has occurred, the Department of Justice will examine the law enforcement agency's budget as a whole and allow agencies to use adopted funds for any permissible purpose as long as shared funds increase the entire law enforcement budget.

43.     Department of Justice policy requires that sharing must be withheld from any state or local law enforcement agency where the governing body, state or local law, regulation, or policy requires or directs 1) specific expenditures of shared funds, 2) the transfer of federal equitable sharing funds to non-law enforcement agencies, or 3) expenditures for nonlaw enforcement purposes.

44.     The DOJ rules require that receiving agencies may not commit to the spending of sharing funds for a certain purpose in advance.

45.     Local departments, including the District's MPD, seek adoption and received money under the adoption program even when state or municipal laws would not have permitted

forfeiture under the circumstances or would not have given funds to the police department if the state or municipality forfeited the property.

46.     These equitable sharing programs are specifically designed to provide a financial incentive to local police departments such as the MPD to seize property.

47.     Asset forfeiture is closely linked to drug crime enforcement through traffic interdiction.

48.     Drug crimes are an especially appealing target for local departments looking for equitably shared funds because they are a federal priority and often involve vehicles, real property, and large amounts of cash, all of which are valuable and forfeitable under federal law.

49.     Traffic enforcement is both a traditional law enforcement activity and a useful means of discovering drug crimes.

50.     An officer may permissibly stop a car with probable cause of any criminal violation, including a minor traffic infraction.

51.     Once the car is stopped, the officer may search it without a warrant if he receives consent from the driver, if a drug dog alerts on the car, or if he has probable cause to believe he will find evidence of any crime.

52.     If the officer finds evidence of an offense for which forfeiture is permitted, he may seize the car, cash, and other property, even if he does not arrest the car's driver.

53.     If he does not find forfeitable evidence, the officer can issue a ticket or a warning. An officer can conduct many such stops in a shift.

54.     Drug crimes can be discovered in other ways, but alternative strategies are unlikely to be as efficient at securing equitable proceeds as traffic enforcement focused on interdiction.

55.     The MPD seizes property from citizens in arrests, usually warrantless arrests, and traffic stops made on the flimsiest of pretexts.

56.     Seizures made in connection with arrest fall most heavily on African Americans because most cars and money are seized in warrantless arrests for drug offenses and in traffic stops and nearly nine[3] out of 10 individuals arrested for drug offenses in the District are African American and nearly seven out of 10 traffic arrests made in the District of Columbia are of African Americans.

57.     The wealth stripped from citizens is staggering – in 2011 just under the forfeiture statutes the MPD Evidence Control Branch submitted $9,613,362.38 worth of property (including $6,140,937.38 in cash and cars valued by the MPD at $3,395,625.00) to the MPD Asset Forfeiture Unit for investigation.

58.     This is addition to currency transferred to the DOJ for adoption.

59.     Since the value of forfeitable property is tied to the value of the property seized rather than the significance of the crime, departments may be able to maximize equitable proceeds by frequently taking property associated with small drug crimes rather than targeting sophisticated organizations.

**Adoption violates District of Columbia law and federal law**

60.     By default the District allowed a handful of officers in the MPD Asset Forfeiture Unit to set policy for the District on civil forfeiture of currency.

61.     The D.C. Council found that due process protections for District residents in the civil forfeiture regime "would be made meaningless, however, if the MPD could use the equitable sharing program to circumvent District law."

---

[3] Racial Disparities in Arrests in the District of Columbia, 2009-2011, Report of the Washington Lawyers' Committee for Civil Rights & Urban Affairs, pages 2-3.

62.     The D.C. Council found that research confirms "when state laws make forfeiture more difficult and less rewarding, agencies are even more apt to turn to the federal government's easier and more generous forfeiture procedures."

63.     The D.C. Council found that for example, within a few years after Missouri reformed its forfeiture laws to require a felony conviction before property could be forfeited, 85 percent of the money and property seized by Missouri law enforcement was being handled under federal law

64.     The MPD's participation in the federal adoption program violates District of Columbia law in several respects.

65.     First, the District's share of adopted funds go directly to the MPD for use by the MPD in violation of the civil forfeiture statute[1] which provide that the proceeds of civil forfeiture must go into the District general fund.

66.     The District's civil forfeiture statute provides that property including currency seized by the District for civil forfeiture must either be forfeited under the District's civil asset forfeiture regime or return the property to the owner.

67.     The District's civil forfeiture statute does not authorize transfer of money seized for civil forfeiture to the federal government for adoption.

68.     Finally, the MPD includes anticipated funds from federal adoptions in its budget contrary to both District and federal law.

69.     As of 2012 the MPD has already budgeted the revenue it receives through the federal forfeiture program for the next four years.

---

[1] In 2011, as part of the Fiscal Year 2012 Budget Support Act, the District directed all proceeds from forfeiture conducted solely by the District to the General Fund. Sec. 9045 and 9067 of the Fiscal Year 2012 Budget Support Act of 2011, effective September 14, 2011 (D.C. Law 19-21). Committee Report, p. 22.

70.     The D.C. Council Committee Report noted that this practice of budgeting forfeiture funds in advance is counter to Department of Justice guidance on equitable sharing.

71.     The MPD's use of the adoption program has weakened the ability of the D.C. Council and the Mayor to use District budgets to influence MPD policy and practices.

72.     The MPD's use of the adoption program has undermined local political control over the MPD.

### Plaintiffs were injured by these seizures

73.     The prosecutors and the MPD are virtually never required to demonstrate to a judge, not even in an *ex parte* hearing, the existence of a nexus between the currency transferred for adoption and criminal behavior.

74.     Plaintiffs were injured by these seizures because the District: (1) took their money for civil forfeiture but did not at the time of seizure give notice to owners telling them who had seized their currency and for what purpose so the owners did not know which retrieval procedure applied; (2) took their money without giving them prompt post seizure hearings at which they could challenge the government's seizure and continued retention of their currency; (3) sent their currency to the DOJ for adoption even though the District of Columbia statutes in effect provided that currency seized for forfeiture determinations should be forfeited by the District or returned to the owner; or (4) provided incorrect addresses to the DOJ so owners did not receive notice of intent to forfeit.

75.     Providing prompt post seizure hearings would have provided a forum before neutral and detached magistrates in which owners could have enforced their right to obtain the return of their currency when the seizure was illegal or to prevent the transfer of their currency to the DOJ pending forfeiture actions.

**The MPD does not provide notice at the time of seizure:** knowledge of a seizure **insufficient to satisfy Due Process**

76.     The MPD did not provide notice at the time of seizure so the owners did not know who had custody of their currency (Mayor or Property Clerk) or why the MPD seized their currency (as evidence, civil forfeiture, or adoption).

77.     An owner could have clear knowledge that their property has been seized by the MPD, but that cannot be considered the equivalent of knowledge of a federal seizure and investigation for the purposes of contesting a forfeiture

78.     The MPD does not provide any written notice in warrantless seizures, not even a property receipt, telling owners which one of the several possible grounds it is seizing the currency for – investigation, evidence, or forfeiture determinations, or adoption.

79.     Nor do MPD officers give persons from whom it seizes currency any written notice with contact information such as a working phone number or a "control or identification number" so people can call the MPD about the status and location of their currency and how to retrieve it.

80.     As a result, owners do not know who has legal custody of their currency – the Superior Court, the Property Clerk, the Mayor, or the District – and thus they cannot tell which retrieval procedure applies (because different retrieval procedures apply depending on which agency has legal custody of the currency).

81.     Moreover, owners do not know that the MPD has a policy of sending most seizures of currency in excess of $2,000 to the DOJ for adoption.

82.     Since they do not know who has custody of their currency they do not even know whether a Rule 41(g) motion is available to them.

83.     MPD general orders require the seizing officer to complete a "PD 81," a police form describing the property and the reason for its seizure (e.g., investigation, civil forfeiture), within 24 hours of the seizure. The PD 81 is typically completed and entered into the MPD property tracking database or typed directly into the MPD property tracking database before the seizing officer completes their shift.

84.     However, the MPD do not give a copy of the PD 81 to the owner or driver (if different from the owner) of the seized currency until discovery is provided in the criminal case -- if a prosecution is instituted at all.

### After Property Seized

**It is very difficult and time-consuming for owners to try to locate their currency, determine why it was taken, and to figure out how to get it back using informal methods**

85.     Owners have no effective way to get currency back once the MPD seize it whether for investigation or as "evidence" or for forfeiture determination or civil forfeiture.

86.     Most owners start with the police District in which the property was seized and then move on to the Property Clerk or one of the prosecuting agencies.

87.     Typically the seizing officer will not provide the owner or driver with a property control number. In a classic catch 22, the Property Clerk will not state whether it has currency, or wide, until the owner can provide a property control number.

88.     With respect to currency seized for civil forfeiture the Property Clerk will not speak to owners about their currency until forfeiture determinations have been made and bonds set (under the pre-amendment forfeiture regime) and notice sent and that can take many months.

89.     Owners cannot monitor their property simply by calling the Property Clerk (sometimes no working phone during the class period) without a property control number

90.     The MPD does not maintain a website of currency seized for investigation or as possible evidence so owners cannot monitor the status of their property simply by checking a website.

91.     Claimants must try to monitor their property and learn when the District no longer needs it by calling the Property Clerk over and over or by going to the impoundment lot which is located in a remote corner of the District.

92.     Neither prosecuting agency maintains a publicly available list of currency on which they have evidentiary holds or a publicly available central number which owners can call to determine if the prosecuting agency has a hold on their currency.

93.     As a result of not receiving notice at seizure, owners must bounce from office to office an agency from agency trying to locate who has seized their currency and for what purpose.

94.     Most owners get a big run-around from the Property Clerk when they try to learn who has their property and why.

95.     Besides not providing notice at seizure, seizing officers often provide misleading information, such as telling owners they do not have their currency when they in fact do, or that they will never get their property back.

## No prompt post seizure hearings as required by the Fifth Amendment

96.     The District does not give owners of seized currency prompt post seizure hearings presided over by neutral magistrates in which owners can present their objections to the seizure or the District's continued retention of their currency or the District's plan to send currency to the DOJ for adoption.

97.     Meanwhile, property owners are denied access to the use of their currency.

98.     The lack of a prompt post-seizure hearings thus permits the District to retain private currency and to transfer it to the federal government for adoption even if the seizing officer's asserted basis for seizure is not supported by probable cause and the District's need for currency for civil forfeiture or investigation or as possible evidence has evaporated.

99.     One of the major benefits to owners of a prompt post seizure hearing is that it creates a forum in which all interested stakeholders must appear and assert a claim to a seized currency if the prosecutor wishes to retain the currency as possible evidence.

100.    The main practical benefit of the hearings to owners is that they relieve owners of the burden of having to track down every party potentially interested in seized currency and negotiate separately with each party.

101.    Prompt post seizure hearings would also have prevented adoption in many, many cases.

**Rule 41(g) does not provide a prompt, effective remedy for obtaining judicial review of currency seized for investigation or as possible evidence when it is available at all. Rule 41(g) not available for months after seizure**

102.    Rule 41(g) motion not available to persons whose currency has been seized for civil forfeiture because the currency is in the custody of the Mayor.

103.    If a prosecution has never been initiated then there is no case in which an owner can file a Rule 41(g) motion.

104.    Typically however, if an owner does file a Rule 41(g) motion, the judicial officer will not entertain the motion until after ascertaining whether the District intends to forfeit the property, a process which can take months, or until the end of the criminal case.

105.    It is not clear from the text of Rule 41(g) and the applicable case law whether Superior Court judicial officer can even entertain a Rule 41(g) motion until after the case is terminated, and

there are no reported Superior Court or District of Columbia Court of Appeals opinions ordering the Property Clerk or prosecutor to release currency before the end of a criminal prosecution.

106.     Rule 41(g) is not available if a criminal prosecution involving the currency is never instituted because the case is "no papered," that is, the prosecution declines to initiate a case.

107.     Moreover, judicial officers in both the District Court and the Superior Court have a practice of not entertaining Rule 41(g) motions until they ascertain whether the District intends to institute civil forfeiture proceedings against the currency.

108.     For example, even when currency is seized solely for investigation or as possible evidence instead of for a forfeiture determination, judicial officers do not know why the currency is seized, and judicial officers have a practice of not entertaining Rule 41(g) motions until they ascertain whether the District intends to institute civil forfeiture proceedings against the currency.

109.     The mere possibility that the District may institute file civil forfeiture proceedings against currency has largely Rule 41(g)'s utility for retrieving currency seized as possible evidence.

110.      Courts routinely deny Rule 41(g) motions without prejudice in order to allow the District time to complete the requirements of the forfeiture statute even when the courts do not know whether the District has instituted civil forfeiture proceedings. *See e.g.*, United States v. Sweet, 2008 U.S. Dist. LEXIS 40831, at *1 (D.D.C. May 23, 2008) (denying a Rule 41(g) motion and ordering the District to file a notice whether civil forfeiture proceedings have been initiated).

111.     Some courts even take the position that all property seized by the MPD, even property seized for investigation or as possible evidence, is in the custody of the Mayor and thus beyond the reach of Rule 41(g). *See* Akintomide v. United States, 2000 U.S. Dist. LEXIS 16626, *2-3 (D.D.C. Oct. 31, 2000).

112.     Mr. Williams' experiences illustrate the difficulties owners face when trying to use Rule 41(g) as a remedy to obtain possession of their currency after they have been seized by the MPD and the prosecutor for use as potential evidence or civil forfeiture.

113.     The MPD send money to the DOJ for adoption before owners have time to file Rule 41(g) motions.

**Experiences of the named plaintiffs illustrates the unfairness of the Districts civil forfeiture system**

**Ann Melton and Gregory Dutka.**

114.     Ann Melton and Gregory Dutka are a husband and wife who live in Elk Grove, California, and operate a music business in Stockton, CA.

115.     On July 3, 2013, Ms. Melton and Mr. Dutka's son, Willie Honable, was driving their car, which is registered in the name of Gregory Dutka, with their permission in Washington, D.C. while he was on a business trip for their music business to the Washington region to set up promotions for nightclub performances, sales of recorded music, and a concert, all under my management. Ms. Melton and Mr. Dutka were in California at the time of the arrest.

116.     Ms. Melton and Mr. Dutka also gave him a sum of money, over $5,000, to use for expenses on the business trip.

117.     D.C. police officers stopped and arrested Mr. Honable after a passenger in the car sent a message on her cell phone that she was going to use marijuana.

118.     Ms. Melton and Mr. Dutka's son was arrested for "pandering". The charges against him were dismissed after a plea to a single charge that did not support forfeiture of Ms. Melton and Mr. Dutka's currency.

119.     During my son's arrest, the police officers seized the car and all the money he had on his

person and in the car, approximately $3,831.00 in cash that he was carrying to use to pay work crews for concert promotions and preparations in the Washington, D.C. area.

120.    The approximately $3,831.00 in cash belonged to Ms. Melton and Mr. Dutka's business.

121.    Mr. Honable's son gave the police Ms. Melton and Mr. Dutka's correct residence address at the time of the arrest.

122.    The police officers did not provide Mr. Honable with any form of receipt or acknowledgment for their seizing the car and the cash nor did they tell him why they were seizing the car and the cash.

123.    At the time of the seizure the MPD officers did not give Ms. Melton and Mr. Dutka any receipt or writing or notice to show they had seized their money or car nor did they give them any written instructions on where they were taking my property or how to get it back.

124.    Nor did the MPD give Ms. Melton and Mr. Dutka (by mail or otherwise) notice of a prompt (within two weeks) hearing at which Ms. Melton and Mr. Dutka could have an opportunity to regain possession of their property or challenge their taking it or keeping it.

125.    After much effort and the aid of an attorney, my Ms. Melton and Mr. Dutka's attorney's investigator was able to retrieve their car from the MPD storage lot a few weeks after it was seized. He then drove the car back to California.

126.    Later Ms. Melton received a notice of intent to administratively forfeit property from the MPD which stated she needed to post a bond of $250 to avoid administrative forfeiture of the approximately $3,831.00 in cash.

127.    Payment of the bond entitled Ms. Melton to a judicial forfeiture proceeding in Superior Court regarding the forfeitability of the cash.

128.    On August 13, 2013, Ms. Melton submitted a claim and a bond in the amount of $250.00 to the D C Treasure office as requested by the Evidence Control Division for bar code

#10463765, in order to protect the property that was seized ($3,831.00).

129.     Nonetheless, the MPD transferred Ms. Melton's $3,831.00 to the DOJ for adoption.

## Richard Williams.

130.     The District seized $5,361 from Mr. Williams in connection with his arrest on about 10/07/2011 in case number 2011 CMD 19545.

131.     The MPD transferred Mr. Williams' $5,361 to the DOJ on 12/12/11.

132.     The MPD did not obtain a release from the US Attorney pursuant to the Property Clerk statute before sending the money to the DOJ for adoption.

133.     On about 10/07/2011 the MPD arrested Mr. Williams for possession of what the police say was a controlled substance (marijuana) in 6D.

134.     Mr. Williams did not commit any offense.

135.     The substance the MPD thought was a controlled substance (marijuana) was not a controlled substance.

136.     It was a substance which resembled marijuana in appearance but not substance which was legal to buy and sell in the District.

137.     The arresting officers also seized $5,361 in cash from Mr. Williams.

138.     Mr. Williams had won the money in a casino and from other legal sources.

139.     Mr. Williams was found CJA eligible.

140.     Mr. Williams gave his correct address to the MPD when he was arrested and booked.

141.     That address is a house in Northeast (District of Columbia) and Mr. Williams' people have lived in that house continuously from years before his arrest in this case up until the present.

142.     At the time of the seizure the MPD officers did not give Mr. Williams any receipt or writing to show they had seized his money nor did they give him any written instructions on where

they were taking his money or how to get it back nor at any time did the MPD give Mr. Williams (by mail or otherwise) notice of a prompt hearing at which he could have an opportunity to regain possession of his money or challenge their taking it or keeping it.

143.    Mr. Williams was given a court appointed lawyer.

144.    The government ultimately nolle'd the case (2011 CMD 19545) on 01/25/2012 (for the second time).

145.    The AUSA executed a certificate/ Property Release stating the US Attorney had no objection to the release of the property dated 3/12/2012.

146.    The District never sent Mr. Williams a notice of any kind indicating that the money was subject to forfeiture or available for pick-up nor did the District ever return his money.

147.    Mr. Williams never received any notice at the house in Northeast DC mentioned below or anywhere else.

148.    Mr. Williams was incarcerated in the DC Jail and then the federal system (Talledega, AL) from 12/31/2011 till 11/16/2012.

149.    In September 2012 while in Talledega, AL, Mr. Williams filed a Pro Se Motion to Compel the Return of Property which was docketed on 9/21/2012.

150.    The motion had his Talledega, AL FBP address and he received copies of filings in the case at that address from both the Superior Court and the District's Office of the Attorney General ("OAG").

151.    The District did not oppose the return of the money in part because the AUSA had executed a certificate/ Property Release stating it had no objection to the release of the property dated 3/12/2012 (case *nolle'd* 1/25/2012).

152.    Nor did the OAG inform the Court or Mr. Williams that the MPD had transferred his money to the DOJ for adoption within 60 days of seizure.

153.    The Superior Court ordered the District to return to Mr. Williams's $5,361 which the MPD had seized from Mr. Williams.

154.    Mr. Williams believes the District seized more money but they did not give Mr. Williams a receipt or inventory indicating how much they took.

155.    The Property Release form lists the amount of currency seized in connection with 2011 CMD 19545 as $5,361.

156.    But, the District did not return Mr. Williams money to him while he was in Talledega, AL.

157.    The day after Mr. Williams returned home, 11/16/2012, Mr. Williams went to Shannon Place (the former location of the Property Clerk) to get his money back.

158.    That location was closed so he went to the new location of the Property Clerk which was taped to the door at Shannon Place.

159.    Mr. Williams then went to the Property Clerk at the new location and showed the desk employee the Superior Court order and asked for his money back.

160.    The desk employee told Mr. Williams the money was not in the system so the Property Clerk did not have it and they did not know where it was.

161.    A supervisor came out and said just because there was a court order did not mean the Property Clerk had to give the money back because maybe the money was held for a forfeiture determination.

162.    However, neither he nor anyone else checked whether the money was held for forfeiture.

163.    Mr. Williams really needed the money when he returned to the District from prison.

164.    Mr. Williams's investigator, Jannetta Smith on January 31, 2014 called the District of Columbia MPD Evidence Control Branch at 202-727-3230 to ask them about property seized by the MPD from Mr. Williams' which he believed had the property control number 1027 2852.

165.    Ms. Smith spoke to Technician Ferguson who said the following.

166.    The MPD seized $5,316 from Richard Paul Williams on about 10/6/2011 in connection with an arrest for possession of marijuana [which was not marijuana].

167.    Technician Ferguson looked in a database she uses in her job as technician in the Evidence Control Branch.

168.    Technician Ferguson confirmed that the property control number was 1027 2852.

169.    Ms. Smith told Technician Ferguson Mr. Williams' address was 23 Anacostia Road, NE. Technician Ferguson said her records showed the address was 23 Anacostia Road, **SE**.

170.    Technician Ferguson stated that on 12/12/11 the MPD transferred Mr. Williams $5,316 in currency to the DEA.

171.    Technician Ferguson then referred Ms. Smith to Lt. Christianson, the name which appeared in her records as the point of contact.

172.    Ms. Smith called Lt. Christianson the same day who asked her identity.  Ms. Smith told him she was an investigator for an attorney who represented Mr. Williams.  Lt. Christianson then promised to call Ms. Smith back.

173.    When Lt. Christianson called back [same day] he immediately said he would not discuss this matter with an investigator, only with an attorney.  He said he would speak to an attorney but not an investigator.  He further said he had never discussed matters of this type with an investigator.

174.    The next day Mr. Williams' attorney and Ms. Smith both called Lt. Christianson on a three way call initiated by the attorney to the number at which Ms. Smith had called Lt. Christianson the previous day.  Lt. Christianson did not answer but voice mail came on.  The attorney left a message asking Lt. Christianson to return the call to the attorney.

175.     On February 6, 2014 Ms. Smith again called Technician Ferguson to confirm that MPD had sent a notice of intent to administratively forfeit property to Mr. Williams on **7/19/2012**, almost half a year after transferring the money to Mr. Williams.

176.     Technician Ferguson confirmed that on 7/19/2012 the MPD sent a notice of intent to administratively forfeit the property to Mr. Williams at 23 Anacostia Road, **SE**.

177.     Technician Ferguson said Ms. Smith should call Sgt. Minor about getting a copy of the notice.

178.     The MPD would not provide a copy to Mr. Williams or any of his agents.

179.     The District still has not returned Mr. Williams' money to him even though the AUSA executed a Property Release and Judge Retchin of the District of Columbia Superior Court ordered the District to return the money to Mr. Williams in an order docketed 11/08/2012.

## Substantive Allegations

## Claim One

## Fifth Amendment Procedural Due Process Claim for failure to provide notice at seizure

180.     Ann Melton, Gregory Dutka, and Richard Williams as Named Plaintiffs re-allege all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

181.     The District seized Ann Melton, Gregory Dutka, and Richard Williams' and the other class members' currency and sent it to the US government for adoption.

182.      The District never gave them individualized notice at the time of seizure of seizure of the currency with information about which agency was seizing their currency (Mayor for civil forfeiture or Property Clerk as evidence; US Attorney or OAG) which agency had legal custody of their

currency (Mayor or Property Clerk) and for which purpose (as potential evidence or for civil forfeiture or for adoption), and which retrieval procedures applied, and what those retrieval procedures were.

183.    This claim for notice is separate and independent from the claim for notice derived from the claim for prompt post seizure hearings.

**184.**    This pattern and policy of the District violated their procedural due process rights under the Fifth Amendment to the United States Constitution.

**185.**    Ann Melton, Gregory Dutka, and Richard Williams and the other class members were injured thereby and suffered damages.

## Claim Two

## Fifth Amendment Procedural Due Process Claim for failure to provide prompt post seizure hearings and notice of the hearings

186.    Ann Melton, Gregory Dutka, and Richard Williams as Named Plaintiffs re-allege all foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

**187.**    The District seized Ann Melton, Gregory Dutka, and Richard Williams' and the other class members' currency for forfeiture determinations and for civil forfeiture under the DC civil forfeiture regime and then transferred it to the federal government for adoption.

**188.**    The District never gave them prompt post seizure hearings at which they could challenge the seizure or the retention of their currency in violation of their procedural due process rights under the Fifth Amendment to the United States Constitution.

189.    Ann Melton, Gregory Dutka, and Richard Williams and the other class members were injured thereby and suffered damages.

## Class Action Allegations

## Class Allegations for Each Class

**190.**     Named Plaintiffs ask the Court to certify under Rules 23(a) and 23(b)(2) and (b) (3) the three separate classes defined below on their own behalf and on behalf of the classes defined below injured (or presently subject to injury) by the policy and practice and custom of the District described herein.

## Claim One: no notice at seizure

191.     Ann Melton and Gregory Dutka, Muslimah Taylor, and Richard Williams bring this action under Rules 23(a) and 23(b) (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person (a) from whom the District seized property during the period from October 28, 2009 to the termination of this action (b) without giving him or her at the time of seizure individualized written notice of seizure of property, an inventory of the property, and individualized notice of procedures for the return of the property.

## Claim Two: no prompt post seizure hearings

192.     Ann Melton and Gregory Dutka, Muslimah Taylor, and Richard Williams bring this action under Rules 23(a) and 23(b) (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person (1) whose property from October 28, 2009 until the termination of this case has been, or will be, (2) seized by the District of Columbia; and (3) given into the custody of the MPD Property Clerk and to (4) to whom the District did not provide a prompt post-seizure hearing before a neutral arbiter at which such person could test the validity of the seizure and the

validity of the continued or continuing government retention of the property pending any forfeiture determination or investigative or evidentiary holds or for any other reason.

## Class Allegations Applicable To All Classes

193.    Certification of a class under Federal Rule of Civil Procedure 23(b)(2) is appropriate, because defendant had a policy and engaged in a pattern and practice of conduct that has uniformly affected all members of the class and declaratory relief against Defendant will benefit each and every plaintiff and class member.

194.    The classes are entitled to declaratory relief.

195.    Certification of classes under Federal Rule of Civil Procedure 23(b)(3) is also appropriate, in that common questions of law and fact predominate over any individual questions, and a class action is superior for the fair and efficient adjudication of this controversy as detailed below.

196.    Regarding the Named Plaintiffs, and members of the classes, there are no individual questions on the issue of liability.

197.    Each class is so numerous that joinder of all members is impracticable. The exact number of class members is unknown to plaintiffs at this time, but, based on MPD disclosures, documents, and representations to this Court in other cases, is likely to consist of at least over 600 people for each class.

198.    The Named Plaintiffs' claims are typical of the claims of the other members of the class, because the Named Plaintiffs and all other members of each class to which they belong were injured by exactly the same means, that is, by the failure to provide adequate notice or hearings.

199.    The Named Plaintiffs will fairly and adequately protect the interests of the members of each class to which they belong and have retained counsel who are competent and experienced in complex federal civil rights class action litigation and/or complex federal prisoner rights litigation.

200.    The Named Plaintiffs have no interests that are contrary to or in conflict with those of each class to which they belong.

201.    The Named Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action, and the class action is superior to any other available means to resolve the issues raised on behalf of the Classes. The class action will be manageable because so many different records systems exist from which to ascertain the members of the putative class.

202.    Defendant District of Columbia has within its computerized records (such as CJIS and LEADS, the MPD's booking databases; and Evidence on Cue, the database in place at property division since 2009) and paper records the names and addresses of all the current and past class members.

203.    Class treatment will be superior because liability can be determined for each Named plaintiff and each class member on a class wide basis either as a matter of law or by using data from the PD 163 and the PD 81 as entered into the District's computerized databases.

204.    Actual damages can also be determined on a class wide basis through use of expert testimony and the District's own valuations of similar currency.

205.    General damages can be ascertained on a class-wide basis,


## RELIEF DEMANDED

Each Named Plaintiff respectfully requests that this Court grant them and the classes they represent the following relief:

**A.**    Enter a judgment in favor of plaintiffs and the class described herein;

**B.**    Enter such other declaratory judgments as this Court deems just and proper.

**C.**      Enter such judgments for injunctive relief as this Court deems just and proper.

**D.**      Enter a declaratory judgment declaring the District's implementation of its policies for

seizing currency is potential evidence is unconstitutional because the District did not provide

prompt post seizure hearings at which owners could challenge the validity of the seizure and

retention of their money cars.

**E.**      Enter a judgment awarding plaintiffs attorneys' fees and costs incurred in bringing this

action under 42 U.S.C. § 1988; and

**F.**      Grant such other relief as this Court deems just and proper.

| | |
|---|---|
| Respectfully submitted, | Respectfully submitted, |
| /s/ William Claiborne<br>WILLIAM CLAIBORNE<br>D.C. Bar # 446579 | /s/ Lynn E. Cunningham<br>Lynn E. Cunningham, Esq.<br>D.C. Bar # 221598 |
| Counsel for Named Plaintiffs | Counsel for Named Plaintiffs |
| 2020 Pennsylvania Ave, NW<br>#395<br>Washington, DC 20006<br>Phone 202/824-0700<br>Email claibornelaw@gmail.com | P.O. Box 1547<br>Dubois, WY 82513<br>307-431-4158 (cell)<br>Email lcunningham@law.gwu.edu<br><br>Admitted in New York, Washington, D.C.<br>and Wyoming. |

## JURY DEMAND

Plaintiffs demand a jury of six as to all claims so triable.


/s/William Claiborne
WILLIAM CLAIBORNE
D.C. Bar # 446579
Counsel for Plaintiffs and the Classes